[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter comes before the court on a complaint seeking dissolution of the marriage of the parties and other relief. The matter originates in the Litchfield Judicial District. Among other issues in dispute is child custody; therefore, it was referred to the Regional Family Trial Docket for trial.
The court finds it has jurisdiction over this matter. The parties were married on December 29, 1989. The plaintiff has resided in the State of Connecticut for more than one year prior to the bringing of this action. There has been one minor child born to the wife since the date of the marriage, Eric Jones, born September 23, 1992. No other minor children have been born to the wife since the date of the marriage, and, she is not currently pregnant. The parties have not been recipients of public assistance.[1]
This matter was tried over seven days. The witnesses have included the parties, a family relations counselor, a clinical psychologist who performed a court ordered evaluation, a teacher and the principal of Eric's school, a psychiatrist who testified on behalf of Mr. Jones, the rabbi of his local congregation and numerous fact witnesses. Numerous exhibits were submitted. The plaintiff, in her claims for relief, is seeking a dissolution of marriage, sole legal custody of the minor child, and physical custody to her, with a specified schedule of visitation for the defendant. Initially, at the onset of the trial, she had sought joint legal custody with final decision-making to her. As the trial progressed, she submitted revised claims for relief seeking sole custody. The defendant in his claims for relief seeks joint custody, primary residence to him and a schedule of visitation for the plaintiff. During the evaluation process he had sought sole custody with very limited contact to occur between Eric and Mrs. Jones. Each party also CT Page 4864-aq seeks specified relief regarding property, child support, health insurance and expenditures and attendant issues. The claims for relief of attorney for the minor child seek joint legal custody with final decision making with Mrs. Jones and primary residence to Mrs. Jones with a specified schedule of visitation for Mr. Jones.
The court has carefully considered the statutory and case law criteria for the dissolution of marriage, custody, visitation, child support, health insurance and health expenditures, life insurance, attorneys' fees, and assignment of property (Connecticut General Statutes section46b-81) and alimony (section 46b-82). The court finds the following facts.
This is a first marriage for both of the parties. The parties had each completed their respective educations and been in the workforce, each as their own self-support for years before they met.
The plaintiff is a well-educated woman: she attained a bachelor's degree from Connecticut College, a master's degree in social work from Smith College, and two other master's degrees from Yale School of Medicine and Yale School of Management, in public health and organizational management respectively. She is in good health. She is presently employed by Life Care Services, at Pomeraug Woods, where she is the Associate Assistant Administrator, earning $50,000 per year. She also receives a benefits package including health, dental, disability and life insurances. She has been in this employment since May 1, 1998. She works full-time presently 9 a.m. — 5 p.m., Monday through Friday. There is a degree of flexibility in the hours she works. Her job entails very little travel: occasionally within the State of Connecticut and 1 to 2 business trips out of the State per year, always for less than a week.
Ms. Jones' was employed at the time of the marriage in Utica, New York at a hospital where she was vice-president for Administration. Her income when she left there was $51,000 per year. She left that position for employment at Charlotte Hungerford Hospital in Torrington as Associate Administrator for Operations from 1992 to 1994. Her income when she left there was $83,000 per year. Her employment ended when her position was eliminated as a part of a reduction in the workforce of the hospital.
Ms. Jones was then unemployed for a period of time. This proved to be economically difficult because she was virtually the sole wage earner contributing to the support of the family. Eric was born in 1992 and thus, 2 years old during this period of unemployment. She could not find a job in her field in Connecticut or nearby New York. Ms. Jones accepted CT Page 4864-ar a position as the Administrator of the Lutheran Home in Worcester, Massachusetts. She was given accommodations there and would often stay over several nights a week. Ms. Jones would occasionally bring Eric up and they would stay together overnight. That position paid $62,000 per year. Ms. Jones did not stay with it, finding the commute distasteful.
She procured employment back in Connecticut as the Administrator of the Sharon Health Care Center. She was in this position from 1995 to the fall of 1997. Her income when she left was $67 — 68,000 per year. Ms. Jones was forced to leave that employment as a result of differences with the supervisors which she felt resulted from her reporting of irregularities she perceived in some of their financial records. Thereafter, she remained unemployed until her current employment.
Mr. Jones is 55 years old. He has a Bachelor's Degree from Adelphi University. He has brokerage licenses from several states. Prior to the marriage he was self-employed for many years in a variety of fields.
Mr. Jones has been a recipient of Social Security Disability for most of the years of the marriage.[2] The determination of the specifics of the disability finding are not before the court. The illnesses and conditions that Mr. Jones complains of are numerous. He has a residual sight problem from a 1978 automobile accident for which he is treated with prisms in his eyeglasses. Whatever his sight problems are, neither they nor the maladies described hereinafter have prevented Mr. Jones from engaging in a variety of tasks, including caring for Eric, flying an airplane, sightseeing in an airplane, traveling by car and airplane, both small and great distances, using the telephone for communication over significant portions of a day, reading, and writing. Mr. Jones has in the recent past engaged in all of these activities. While Mr. Jones may be determined disabled from employment by the Social Security Offices, the court finds, regarding these proceedings, that Mr. Jones is not disabled from all employment, and is therefore able to contribute to his own support and the support of Eric through active employment rather than just through the receipt of Social Security funds. There are perceptible limitations on Mr. Jones: he experiences frequent dry mouth and throat requiring ready accessibility of water; he is not physically able, as a result of the mitochondrial myopathy to engage in strenuous physical exercise. No specific evidence was presented to the court as to his earning capacity in light of both his skills and his limitations.
From the onset of the marriage between the parties there was a mutual decision to continue to hold their respective assets separately. The plaintiff, at the time of the marriage, had between $50,000 and $60,000 CT Page 4864-as in savings. The defendant, at the time of the marriage had about $100,000 in savings. Each brought their own respective furniture, clothes and motor vehicles to the marriage.
During the marriage, in 1991, the plaintiff received an inheritance from her mother's estate of $112,000. She placed these funds in a joint account with her father, which he has managed since that date. Prior to the commencement of this dissolution of marriage, these funds were used for her only for three mortgage payments during her unemployment, and she gave the defendant $12,500 toward the purchase of a motor vehicle in 1996. In 1999, she utilized $4,000 for furnace and well problems and approximately $70,000 for attorneys' fees and expert witness costs associated with this dissolution of marriage action.
In October, 1995, the defendant received $247,000 net funds from settlement of a lawsuit. He kept those funds in a Merrill Lynch account. Mrs. Jones testified that the Merrill Lynch account had a balance of $310,000 once the settlement proceeds were placed in it, she having seen the bank statements. Mr. Jones did not provide those statements nor was she cross examined on these statements. The court accepts therefore that $310,000 was the amount on hand in that account in October, 1997. He spent down $87,000 on travel, corporate and legal expenses over the next two years in attempts to generate investments or income. He produced absolutely no income from these activities.
He transferred what he termed the remaining balance of $170,000 to Smith Barney two years ago. However, the Smith Barney records do not support this. His Smith Barney account had $10,000 in it on May 31, 1997 which was spent down by Mr. Jones to $0 at the beginning of January, 1998.
Thereafter, the records in evidence show a January 28, 1998 deposit of $100,000. A second deposit of $27,209 by money transfer from Mellon Bank N.A. was made in February, 1998; Mr. Jones does not recall its source. A third deposit of $1,275 by money transfer from Harris Trust and Savings Bank was made on February 9, 1998; Mr. Jones does not recall its source. These are large sums of money, particularly for an individual with no discernable source of income other than his Social Security check. Having observed Mr. Jones' demeanor during the questioning on his finances, the court finds that these evasive answers were not credible and Mr. Jones was not telling the truth. His failure to provide financial records for his deposition as discussed herein, leaves a significant gap in his ability to maintain his credibility due to his incomplete and evasive answers regarding his accounts. CT Page 4864-at
In 1999, Mr. Jones withdrew about $120,000 from the Smith Barney account; approximately $90,000 of it went to legal fees for lawyers here, for his attempted action in Florida, and for a lawyer in Israel.
Whatever cumulative funds (at least: $100,000 at the commencement of the marriage, his Social Security monthly check's, Eric's Social Security monthly checks and $247,000 from a 1995 settlement), Mr. Jones had are no longer in that account or any other fund held by Mr. Jones at least as reported by the defendant on his financial affidavit. The plaintiff sought discovery of the statements of the account as part of a production request accompanying a notice of the defendant's deposition on January 19, 2000 in preparation for these proceedings. The information sought was not supplied by the defendant. The evidence discloses that the defendant utilized all of the time from then to the trial for other purposes. He was capable of complying with the request and wilfully failed to do so. Sanctions, therefore, apply. The sum total of education expenses he paid for Eric for pre-kindergarten and kindergarten do not begin to approach the hundreds of thousands of dollars he has apparently spent without providing documentation or proof when requested. Furthermore, he was receiving Eric's Social Security funds as a fiduciary to utilize for the youngster's support. Mr. Jones squandered significant sums of money, or, has hidden them. No other alternatives are available. He has impoverished himself. At least until August, 1999, all of Mr. Jones' shelter costs through the marriage were paid by Mrs. Jones. His failure to reasonably preserve his assets has caused his present situation.
In July, 1993, the plaintiff purchased the property at 66 Honey Hill Road, New Hartford, Connecticut for the purchase price of $251,000. She made the down payment of $60,000 from her savings. The balance of the purchase price was paid by her procurement of a mortgage on the property. The property has always been owned by the plaintiff solely. She is the only signer on the mortgage note.
Throughout the entire marriage of the parties, the plaintiff has made all payments of the mortgage, real estate taxes, utilities, and repairs and improvements to the property with the exception of the defendant's contribution in 1995 of $5,000 toward the paving of the driveway. Both the parties paid for food expenses of the family. Each occasionally bought clothing for Eric. When Eric attended pre-kindergarten and kindergarten at private facilities, the defendant paid those tuition costs. They were approximately $12,300.00 in total. The defendant paid no other significant expenses of the family. CT Page 4864-au
The marriage between the parties was always difficult. Neither party could remember a lot of happiness or joy in their marriage. The court does not find either party the sole cause of the breakdown of the marriage. Mr. Jones' lack of financial contribution to the family unit was a matter which caused a significant amount of tension between the parties. The plaintiff was aware of his bank balances. During the 1995 time period, Mr. Jones was actively involved in a business enterprise with a German partner regarding capital investment in the Commonwealth of Independent States. He traveled to the Georgia Republic and Germany. No money ever flowed from this or any of his other business endeavors and interests to the Jones family. From the evidence is drawn a picture of a man who is very busy constantly making and cultivating (schmoozing) contacts all over the United States and in different parts of the world, constantly seeking but never finding the right deal to make his riches. This is a man, therefore, capable of work who never applied himself in a way that would ultimately bring economic benefit to his family. He had the security to rely on the support from his wife's work endeavors. Mrs. Jones' dwindling patience with Mr. Jones' economic efforts was a cause of friction between them. When Mrs. Jones was unemployed, Mr. Jones, the owner of significant funds, refused to contribute to the shelter costs of the family.
Both evaluators, and counsel for the minor children, recommend that this court order joint legal custody, providing Mrs. Jones with final decision making authority where the parties can't agree. "As in other areas where expert testimony is offered, a trial court is free to rely on whatever parts of an expert's opinion the court finds probative and helpful. In, family cases in particular, it would be anomalous to require a trial court to assign particular weight to a report which is based on statements that the trial court may evaluate differently and on circumstances that may have changed. The best interests of the child, the standard by which custody decisions are measured, does not permit such a predetermined weighing of evidence. (Citations omitted.) Yontef v.Yontef, 185 Conn. 275, 282-3, 440 A.2d 899 (1981). While there is legal authority for the issuance of such an order[3] as recommended by the evaluators, it requires the court to first find that the parties are capable of reasoned communication regarding Eric regarding important custodial decisions. That is not the case here. The court finds the presumption that joint legal custody is in the best interests of Eric has been overcome. Connecticut General Statutes section 46b-56a.
There is no ability evident or demonstrated of these parents to come to agreement on any important developmental issues effecting Eric. Mr. CT Page 4864-av Jones wants Eric raised within the Jewish faith, with a willingness to his continued exposure (as in the past) to the festive aspects of Christian holidays (e.g. Easter egg hunts, Christmas tree, etc.); Mrs. Jones thinks Eric should be exposed to both her religion (she is Protestant) and Judaism and then make a choice for himself when he is older. Each party protests that their recommended path was the agreement that they had as parents residing together before the inception of this action. Eric was recommended for retention in the first grade by the school administrators. Mrs. Jones agreed with that recommendation. Mr. Jones strongly disagreed with that recommendation; even after it had occurred, he continued to seek to reverse it. While there has not been significant disagreement between the parties when serious health care issues have arisen for Eric, there is a huge disparity between their respective approaches to the entire issue of Eric's health care. Eric was born without an urethra which required multiple surgeries for him in his infancy and early years and, also, major surgery when he was between kindergarten and first grade. These surgeries and his continuing care for the curative work has required multiple follow up visits with his physicians who are in Boston. Mr. Jones asserts that Mrs. Jones was not attentive to Eric throughout these proceedings. However, she attended all of his surgeries and was present for all of the parental supportive periods surrounding them. Mr. Jones scheduling of the Boston appointments (and many other local medical appointments) for follow up most often conflicted with her work schedule. It is not unreasonable for the family wage earner to attend to her employment responsibilities under those circumstances.
Eric also has asthma. It is not a severe level of asthma. According to Dr. Kavle, Eric's pediatrician, Eric's asthma does not prevent him from engaging in sports and other recreational activities. Mrs. Jones has encouraged Eric's participation in recreational activities. She signed him up for soccer which he played on his days with her, as scheduled. Mr. Jones brought him only occasionally however. His reason for the poor attendance vacillated over concerns of the effect of playing soccer on Eric's asthma, and, his rejection of soccer as a valuable activity for Eric. He felt he had more important activities to participate in with Eric, of what he felt would be a more academic nature. He felt that Eric was over programmed with physical activities with insufficient attention to academic pursuits. Mrs. Jones, on the other hand, felt that Eric spent about six hours every day in school working on academics and a couple of hours daily in day care for social activities, and only about two hours a week in the fall playing soccer. She encouraged more social and recreational activities for Eric.
The parties also differed on summer programming for Eric. Last year CT Page 4864-aw Eric had gone to the Boy Scout camp and by all accounts enjoyed it. Mrs. Jones sought to send him again this coming summer. Mr. Jones, on the other hand, felt Eric had already experienced the Boy Scout camp, it would be repetitive and he would prefer a more academic pursuit for Eric in the coming summer.
Mr. Jones is hyper-vigilant in his responses to Eric's physical well-being and any irregularity that he perceives. Mrs. Jones has a more relaxed approach to Eric's health, not scrutinizing his well-being nearly as closely. Her lack of vigilance in regard to this has been described as significant as Mr. Jones' own zealousness.
Thus, in virtually all developmental areas of Eric's life, his parents have significantly disparate views and philosophies. These are parents who agree on little when it comes to Eric. Joint custody is dependent on an ability of the parties to communicate regarding these very issues and value each other's viewpoint so that a decision can be reached jointly. Not only do they share little in common in their respective outlooks on Eric's appropriate upbringing, but there is no mutual respect between them. The conflict between them has been growing over most of their marriage and certainly since Eric's birth. For all of the reasons recited above, and as found throughout this decision, the Court does not enter an order of joint custody. Connecticut General Statutes section 46b-56a(b)
The birth of Eric, while joyous on the one hand, also created an ongoing, relentless source of conflict between these two people. Mr. Jones, steadily and persistently assumed the major parenting responsibilities for Eric when he was an infant, after Ms. Jones returned to work. In 1996, Mr. Jones visited an attorney toward the end of divorce and seeking custody of Eric. After that visit, he engaged in a campaign of exerting increasing control over Eric and terrorizing Mrs. Jones with his verbal warfare. Her responses were often severe and highly emotional.
He became extremely proprietary in this endeavor, viewing himself as the only capable parent in the household to perceive and respond adequately and properly to Eric's needs. When Mrs. Jones was not at work she attempted to attend to Eric as an involved parent, over the constant criticism of Mr. Jones. On one occasion in December, 1996, when she had planned to take Eric to Florida to visit her father (who was recovering from colon cancer surgery), Mr. Jones (notwithstanding his agreement that they take this trip) woke Eric up at 3 a.m. and kept him out in his car so that he was not home for Mrs. Jones when she awoke to take him with her on the airplane. CT Page 4864-ax
Over time, Mr. Jones became increasingly verbal in his disdain for Mrs. Jones as the mother of Eric. He shared these feelings regularly and repeatedly with Eric. He denigrated Mrs. Jones to her face in front of Eric and, also, to Eric when she was not present. He is incapable of attributing any worth to Mrs. Jones as a parent.
In preparation for this trial, Mr. Jones retained Dr. Steven Billick to evaluate his appropriateness as a parent. Dr. Billick, a psychiatrist who works largely with children, acknowledged that Mr. Jones came to him with no appreciation of Mrs. Jones' value as a parent and making the same accusations against her. Dr. Billick assures the court that as a result of therapy that he did with Mr. Jones during the evaluation process, from October, 1999 to January, 2000 he has succeeded in getting Mr. Jones to back down from these accusations and appreciate the importance of Mrs. Jones in the life of Eric. Mr. Jones testified immediately following Dr. Billick and parroted the same assurances. The court does not believe that Mr. Jones has made this kind of major leap in the short time of three months. His testimony under oath in January, 2000 and October, 1999 is that of a man who rejects the notion that Mrs. Jones has any worth as a parent. During the span of the trial days, he called the New Hartford police to report that he believed Mrs. Jones was intoxicated while care taking Eric. The constable visited the premises immediately and spoke with Mrs. Jones. To the officer she appeared sober, lucid and with no odor of alcohol or other indicia of alcohol consumption. No dramatic change has occurred in Mr. Jones. He remains a man consumed with his role as Eric's parent committed to the exclusion of Eric's mother in his life.
In the interpersonal dynamic between the parties, Mrs. Jones' reaction to the conflict was filled with emotion, sometimes despair, other times outrage and hysteria. However, her conduct, as surreptitiously videotaped by Mr. Jones, and viewed by his expert Dr. Stephen Billick, was not in Dr. Billick's opinion out of the norm for a person confronted with the stresses of a strained marriage. These tapes, while including outbursts by Mrs. Jones, also included statements from Mr. Jones that derogated her. For instance, he said to Eric, "I'll protect you from your crazy mother", and to her, in front of Eric, "You're crazy-see what you're doing to our child." It is not strange to find that Mrs. Jones is most prone to anger when dealing with her husband, as observed by Dr. Phillips: he provokes the response.
As a part of this matter, the parties participated in an evaluation by a Family Relations Counselor and, also, a psychological evaluation which CT Page 4864-ay included psychological testing, clinical interviews and clinical observation of each parent's interaction with Eric. In relating his concerns about Ms. Jones to both of these evaluators, Mr. Jones branded her as a pedophile, alcoholic, and child abuser. Each of these accusations was based upon his allegations arising from incidents that only he observed. As of three weeks before the trial of this matter, he had not retreated from any of these positions, notwithstanding each evaluator having rejected his claims regarding Mrs. Jones.
Mr. Jones is unable to perceive any need for Eric to have a relationship with his mother, or even, that Eric has love for his mother. Mr. Jones also has difficulty accepting the opinions of others that are contradictory to his opinion. While Mrs. Jones has strong opinions as well, she is far more receptive of opinions of others, even if she does not like them. These are findings of Dr. Phillips. After listening to all of the evidence and observing the demeanor of the parties, the court concurs with those opinions and they are, thus, findings of fact.
Mrs. Jones is a bright and well spoken person. She has a very business like nature to her. Mr. Jones has continually challenged her sense of competence in taking care of Eric and his needs. This has made her anxious at times with Eric and too eager to please him. The result is that Eric at times has felt license to be aggressive toward his mother and speak in a disrespectful manner to her, reminiscent of the statements made by Mr. Jones to Eric about his mother. At times, Mrs. Jones has also used harmful language abut Mr. Jones with the child. While inexcusable, the evidence makes clear that it is retaliatory conduct of a person who has been placed in a very vulnerable and persecuted position by Mr. Jones.
As the pendente lite period has unfolded, Mrs. Jones has had an increased amount of time in taking care of Eric exclusive of Mr. Jones. She has successfully set him up with an after school day care program. The exposure to day care and extracurricular community activities had been recommended by Eric's teacher to help him become more comfortable socially with his peers. He had significant problems the previous year in making friends. Mrs. Jones has Eric regularly taking the bus to and from school to nurture his need for independence. Dr. Phillips observed: "She seems inclined to either over-indulge and overstimulate him, or to respond with distance when she feels stressed. At other times, Ms. Jones' practical style seems soothing to Eric who is able to be calmer and more organized when his mother is thus available to him. It appears difficult for Ms. Jones to feel permission to relate to and parent Eric, and she is CT Page 4864-az apt to parent him more comfortably in settings and relationships in which she does not feel personally challenged." The conclusion of these proceedings should serve to reduce the level of never ending stress over the custodial issues and Mrs. Jones' sense of her parental abilities being constantly attacked. Her sense of competence in dealing with Eric will be restored by the day in and day out care of Eric in her custody.
A significant amount of time was spent on evidence surrounding a rowboat ride Eric had on Little Pond on a clear, calm day in the early spring, while in Cape Cod visiting his uncle. He was wearing a life preserver recommended for children 50 pounds or over. Whether he was 49 or 50 pounds on the day in question is of no moment. Mrs. Jones did not exercise poor judgment in allowing and encouraging Eric to take this little boat ride.
On January, 1999, Mr. Jones unilaterally packed up Eric's belongings and took him to Florida. This was the day after an argument between the parents. He intentionally misled Mrs. Jones as to where he and Eric were that day, having told her and left her a note that he was taking Eric for a haircut after school. He then remained with Eric in Florida refusing any attempts at contact from Mrs. Jones who was trying to locate him. He enrolled Eric in school in Florida and rented an apartment with a year long written lease. He initiated no contact with Mrs. Jones. Essentially he hid with Eric in Florida until, they were ultimately found through a law enforcement investigation initiated by Mrs. Jones. He attempted to get an ex parte custody order of Eric in Florida. He was unsuccessful. Mrs. Jones had immediately started process in Connecticut for these proceedings and others to attempt to gain court authority for the return of Eric to Connecticut once he was found. Ultimately, once law enforcement officials located Eric and Mr. Jones, the latter was ordered to bring Eric back to Connecticut and served with process for the same. After some delay, they returned. Mr. Jones has shown no remorse for this removal or insight regarding the harmful effects of the same or the wrongness of his conduct. As a result of events that later transpired, it was discovered that during the January to March period that Mr. Jones had concealed Eric away from his mother in Connecticut, he had taken Eric to Israel. The express purpose of the trip to Israel with Eric was to obtain citizenship for himself and Eric in Israel. Mr. Jones retained an attorney named Michael Shine in Tel Aviv, Israel to pursue citizenship. He paid Mr. Shine $5,000 for his work. Mr. Jones also spent between $7,000 and $7,500 on airfare alone in pursuit of citizenship. The cost of lodging in Israel was very expensive while he was there. Mr. Jones explains that the obtaining of citizenship was to fulfill a dying wish of his father. This explanation is not credible. Mr. Jones had discovered CT Page 4864-ba while in Israel that at Eric's age his mother's approval was required for citizenship. Notwithstanding this asserted purpose of fulfilling a dying man's wish, Mr. Jones tells the court that he abandoned the citizenship goal rather than speak to Mrs. Jones regarding it. In fact, Mr. Jones never even told her that he had taken Eric to Israel until she fell upon the information in the late summer of 1999. Mr. Jones made notes regarding the citizenship inquiry which included "how do I protect Eric legally?" This note, in his own words meant, "These are my own thoughts relating to issues of what we were experiencing with his mother, and I had no intention of doing anything illegal. I wanted to find out what was available to us as far as — I think, pretty much, issues in the United States and Israel."
Mr. Jones' notes speak for themselves, "She physically abuses him and physically neglects him. System here won't keep her from Eric." Mr. Jones also wrote on the same sheet of notes, "If I leave again I won't be able to come back to U.S. will be arrested." The court finds that Mr. Jones' trip to Israel with Eric was for the purpose of obtaining citizenship, toward the goal of remaining in Israel, notwithstanding his protestations to the contrary. Mr. Jones also had notes as to which countries were signatories to the Hague Convention on Child Abduction. They were written for him by an associate of Mr. Shine while in Israel. People who are seeking citizenship for sentimental purposes only do not discuss the country signatories of the Hague Convention on Child Abduction with an attorney. The court finds that Mr. Jones has actively considered the removal of Eric from his mother and the jurisdictional reach of the United States.
All of these notes, along with Eric's passport, Mr. Jones' passport, $5, 400 cash, and two complimentary airline tickets to anywhere in the United States, Caribbean, Mexico and Latin America, and business cards of several individuals were discovered in a waist pouch Mr. Jones had carelessly left behind in Mrs. Jones' bathroom when he took a shower there. On that same day, at court, prior to the discovery of these items in the pouch, Mrs. Jones had entered into an agreement which would allow Mr. Jones to take Eric to Florida, out of the state of Connecticut. Upon the discovery of these items and the passport entry showing the unknown trip to Israel, Mrs. Jones contacted her and Eric's respective counsels. Ultimately, court orders were entered which restrained Mr. Jones from removing Eric from the State of Connecticut.
One of the individuals whose card was in Mr. Jones' pouch was an attorney named Kleinfeld. Mr. Jones paid Kleinfeld $5,000 to set up a Swiss bank account for him. Notwithstanding this payment to Kleinfeld for CT Page 4864-bc these services, Mr. Jones claims to have never funded the bank account. Mr. Jones testified on occasion that the account was "for estate purposes primarily" and on another occasion that it was to protect his assets from the divorce process with Mrs. Jones. Mr. Jones' lack of candor resulted in lies upon lies before the court. He spent far in excess of $17,500 while he had no discernable source of income on all of this for no concrete purpose, he wants the court to believe. His testimony is rejected. From 1996 forward, Mr. Jones pursued a campaign to keep Eric to himself, away from Mrs. Jones. No matter what the cost or pathway may be. The result was what mattered. All of his conduct with Eric and Mrs. Jones has been funneled toward that purpose.
Eric was absent from school 54 days during the academic calendar year 1998-1999. This was first grade for Eric. of the first marking period (September 1 to November 20) he was absent 18 of the 54 school days. Some of the absences were for follow up care from his surgery over the previous summer; others could have been avoided and were at the election of Mr. Jones who was his primary care taker. In October, Eric was identified as a student in need of individualized attention with a tutor on a daily basis because an evaluation found him "at risk for learning to read due to developmental youngness or lack of exposure."(exhibit 12). Eric was making steady and satisfactory progress in this program. Eric was then unilaterally removed from his school when his father whisked him off to live in Florida. He missed 35 days of school in the second marking period. The intensive individualized reading program was filled when he returned. Eric missed a significant portion in the middle of the school year. Many of his academic and associated readiness skills were evaluated as significantly deficient at the end of the school year; his readiness testing bottomed out to the bottom of the special education student level despite his obvious capabilities. This condition existed notwithstanding his excellent attendance upon his return from Florida as a result of the court order. The school recommended his repetition of first grade. Mr. Jones retained an education consultant who evaluated Eric. Her conclusion was that Eric could perhaps go on to second grade with the assistance of much supplemental programming, but that he was academically delayed. Nothing good for Eric came of this move to Florida, in terms of his education. Mr. Jones was not acting in the best interests of Eric when he prevented Eric from attending school day to day so that he could do his hard work of learning to read, write, and simple math.
Eric's school also found that he was having significant social adjustment problems in the 1998-1999 academic year. In the fall, Mr. Jones was driving him to school each day, rather than putting him on the school bus. Eric had great difficulty separating from his father. He CT Page 4864-bd would cling to him often crying. Mr. Jones would bring him to his class this way. This was observed by Eric's classmates. The school principal, aware of the problem, recommended Eric take the bus to and from school to gain independence and to be able to be over his separation by time he presented himself in school to his classmates.. Mr. Jones would not permit Eric to ride the school bus unless he was escorted from the bus upon his arrival home and to his driveway entrance across from the street. Apparently Mr. Jones thought the school bus driver would leave the bus to accomplish this. On a couple of occasions when Mrs. Jones has driven Eric to school he has separated easily from her after a quick kiss good bye.
Eric's dependence on his father is a direct result of his father's inability to nurture Eric's independence from him. Dr. Phillips describes Mr. Jones as a very dependent individual with a need for strong emotional attachment which he seeks from Eric. At least as late as March, 1999, Mr. Jones was showering regularly with Eric. Throughout Eric's life, Mr. Jones has slept with him. This has been a major concern expressed by Mrs. Jones. Mr. Jones would claim that Eric needed him to sleep with him to monitor his asthma. Eric's asthma at its worse, according to Dr. Kavle is not life threatening. It, at its worse, provides Eric great discomfort. It is easily regulated and kept very manageable with medication. There was no medical need for Mr. Jones to sleep with his son throughout his childhood. As of the time of trial, Mr. Jones continues to sleep with Eric when he is at his house. Eric's behavior with his father was observed by Dr. Phillips to be regressed, as compared with his mother. Eric needs to grow as an individual separate from both of his parents. It is essential to his emotional health.
Mr. Jones shuttled Eric from one mental health professional to another over a couple of years, each time seeking to find a professional who would accept his representations that Mrs. Jones had damaged her child psychologically because of her treatment of him. Throughout these occasions he has subjected Eric to an endless barrage of disparaging statements about his mother. Inevitably, Eric came to repeat them as his own statements. Mr. Jones took Eric to the following mental health professionals for consultations, evaluations and/or treatment: Dr. Hellman, Dr. Black, Dr. Kimmel, and Dr. Levy. A court order has been entered, barring the child being taken for any other evaluations with mental health professionals. In violation of the court order, Mr. Jones unilaterally took him to a counselor at Charlotte Hungerford Hospital. When Eric was brought to school late after this appointment, Mr. Jones informed the school that he had taken Eric for an emergency psychiatric evaluation. Eric had recently been at his pediatrician's office, Dr. Kavle, with Mr. Jones. Dr. Kavle observed that in the midst of all of the CT Page 4864-be turmoil of his parents' divorce and custody litigation, Eric would benefit from having his own counselor. He told this to Mr. Jones. There was no emergency quality to this recommendation. It neither required Eric to miss school nor was there any necessity, real or perceived, to violate the court order barring Mr. Jones from taking Eric to yet another mental health professional without the proper prior pre-approval.
Mr. Jones has demonstrated a lack of interest in following court orders that do not meet his needs. During the trial of this matter Mr. Jones took Eric to a physician in Boston for a follow up visit to treatment for a sinus condition without the prior approval of either Mrs. Jones or Eric's attorney. This was a violation of a court order barring the same. Mr. Jones did so with the full knowledge that he was violating a court order.
It is urged that this court order joint legal custody even though the parents cannot agree on anything substantial and lack a personal regard for each other that is fundamental to adequate communication. It is urged because Eric has a strong attachment to both of his parents and the recriminations back and forth have been so vicious, that Dr. Phillips was disinclined to recommend either parent be in total control. The court's orders do not accept this position nor that, specifically of any of the parties. "Under Connecticut law, the trial court's discretion as to custody and visitation is not limited [to adopting the specific custodial arrangement sought by one of the parties]. It has long been established that the court has an independent duty to inquire into custody arrangements even when the parties are in agreement . . . Further, it has been recognized that in contested custody proceedings, the interests of one or both of the parents may be adverse to the best interests of the child. (Citations omitted)" Fiddlemon v. Redmon, 37 Conn. App. 397,403-4, 656 A.2d 234 (1995).
While the reasons of the parties and the expert evaluators are sensible, the result would be untenable for Eric. The recriminations would have no cause to cease, the communication would remain poor, and Eric's development would remain a battlefield between these parents. The court finds that joint legal custody is not in the best interests of Eric.
The court further finds that while both parents bear hostility to each other, Mrs. Jones is willing to and does accept the importance of Eric's retaining an important relationship with his father; Mr. Jones does not recognize the importance of a relationship of Eric with his mother. The court further finds that Mr. Jones has demonstrated that he will act CT Page 4864-bf precipitously and unilaterally to remove Eric from his mother and his lack of adherence to court orders regarding Eric has occurred as recently as during the term of the trial of this matter. The court finds that Eric has benefitted [benefited] over the recent months from spending less time with his father; it has provided him an opportunity to flourish independently and enjoy social relationships with others, so important to his growth. The court finds that Mrs. Jones is far more likely than Mr. Jones to consider the opinion of the other parent. The "court has ha[d] the opportunity to view the parties first hand and . . . assess the circumstances surrounding the dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant. Leo v. Leo, 197 Conn. 1, 4, 495 A.2d 704
(1985); Tutalo v. Tutalo, 187 Conn. 251, 445 A.2d 598
(1982). Weinstein v. Weinstein, 18 Conn. App. 622,625, 561 A.2d 443 (1989).
The court orders:
1 A dissolution of the marriage.
2 Sole custody of Eric to his mother. Provided Mr. Jones gives his own passport to Attorney Dixon to hold, he shall have unsupervised visitation as follows: every other weekend from Friday at 5 p.m. to Sunday at 5 p.m.; every week, Tuesday 4 p.m. to 7 p.m.; on the week following his weekend visitation, Thursday 4 p.m. to 7 p.m. If Mr. Jones has need of his passport for personal travel during the time it is in his possession or control, he shall have no visitation with Eric. All of Mr. Jones' visitation with Eric shall be in the State of Connecticut. If Mr. Jones does not desire to relinquish his passport to Attorney Dixon to hold, then his visitation with Eric shall be supervised only. Said supervision shall be arranged with a professional visitation service only. In that event the parties shall return to court upon motion for approval of the supervision arrangements.
Attorney Dixon shall renew with the appropriate authorities in the United States Department of State, as a permanent order, that during Eric's minority, only his mother shall be the holder of his passport, and no new passport or visa should be issued for Eric unless she originates the application.
It is the intent of these orders to prevent Mr. Jones from, once again, unilaterally removing Eric from his home and mother to another jurisdiction, domestic or foreign. While unsupervised visitation is preferable for the natural flow of Eric's relationship with his father, supervision will be necessary where Eric's physical security is at CT Page 4864-bg continued risk of another flight from his home in Connecticut with his mother, because of actions of his father.
The following vacation and holiday schedule shall prevail over the normal weekly schedule. In the summer, each party shall have two non-consecutive weeks with Eric for vacation. Mr. Jones shall have Eric for the winter (typically February) school break yearly and Mrs. Jones shall have Eric for the spring (typically April) school break yearly. Mrs. Jones shall have Eric with her for Good Friday, Easter and Christmas Eve and Christmas Day yearly. Mr. Jones shall have Eric with him for the first night of Passover, after school to 9:00 p.m., Rosh Hashana (9 a.m. to 8 p.m.), Yom Kippur (9 a.m. to 8 p.m.), and two nights of Hanukkah (that do not conflict with Christmas Eve and Christmas) after school to 8 p.m. Mr. Jones shall have Eric yearly on Father's Day, and Mrs. Jones shall have Eric yearly on Mother's Day. In even numbered years, Mr. Jones shall have Eric on Memorial Day, Veterans' Day and Columbus Day. On odd numbered years, Mr. Jones shall have Eric on Fourth of July, Labor Day and Thanksgiving. In even numbered years, Mrs. Jones shall have Eric on Fourth of July, Labor Day and Thanksgiving. In odd numbered years, Mrs. Jones shall have Eric on Memorial Day, Veterans' Day and Columbus Day. Presidents' Day shall follow the weekly schedule. Mr. Jones' visitation on holidays shall be from 9 a.m. to 7 p.m.
Mr. Jones may speak by telephone with Eric once every day for no more than five minutes, on days that he does not see Eric under the above visitation schedule. Mrs. Jones shall initiate these telephone communications for Eric.
On weekend, holiday and vacation days that Eric is with his father, Mr. Jones shall have Eric call his mother once in the morning before 9 a.m. and once in the evening before 8 p.m.; the telephone that is utilized for the call shall not have a caller ID block utilized on it. Mrs. Jones may speak to Eric for a period up to five minutes on each occasion. This provision is for the purposes of telephone visitation and additional assurance that Mr. Jones has not removed Eric from physical presence in the state of Connecticut.
In the event an appeal is taken from this decision, these orders also stand as interim orders. Yontef, op.cit. at 293-4.
3. Mr. Jones shall pay child support in the amount of $127 per week, until such time as Eric's Social Security dependency checks are redirected to the mother's home for Eric. Said order is in compliance with the Child Support Guidelines. Jenkins v. Jenkins, 243 Conn. 584, CT Page 4864-bh 592-4, 704 A.2d 231 (1998). Once those checks are redirected, based upon the present finances of the parties, as disclosed during the trial of this matter, no further child support payment shall be due from Mr. Jones to Mrs. Jones.
4. Mrs. Jones shall maintain health insurance for the minor child as it is available through her employment. Yearly, she shall pay the first $100 in Eric's health expenditures not paid by insurance; thereafter, in accordance with the Guidelines she shall pay 67 % and Mr. Jones shall pay 33% of health expenditures not paid by insurance. Health expenditures is to be broadly construed to include but not be limited to: medical, dental, hospital, orthodontic, pharmaceutical, eyeglasses, optometric and opthamalgic, psychological, psychiatric, and physical therapy.
5. Mr. Jones is prohibited from taking Eric to any medical or mental health appointment without the express written consent of Mrs. Jones. Mr. Jones is prohibited from removing Eric from school, camp or any extracurricular activity without the express written consent of Mrs. Jones.
6. Mrs. Jones shall pay Mr. Jones $1.00 per year alimony, which shall terminate upon the earlier event of his death, her death, his remarriage, cohabitation as defined by statute and case law, or his 65th birthday. Said alimony is nonmodifiable as to term.
7. Mrs. Jones shall remain the sole owner of the real estate at 66 Honey Hill Road, New Hartford, Connecticut, free of any claim of the defendant.
8. Mrs. Jones shall remain the sole owner of the 1999 Ford Explorer, the contents of her home, her checking account, her TIAA CREF retirement annuity and her interest in the Merrill Lynch account she holds jointly with her father.
9. Mrs. Jones shall maintain the life insurance available to her through her employer for the benefit of Eric through his period of minority.
10. Mr. Jones shall remain the sole owner of the 2000 Chevrolet Lumina, his interest in real estate at 5890 N.W. 64th Avenue, Fort Lauderdale, Florida, the furnishings in his possession and his bank accounts at Washington Federal, Bank Boston and Smith Barney all as shown on his financial affidavit.
11. Mr. Jones is solely responsible for all of the credit card debt and CT Page 4864-bi medical debt for himself as well as his debt to his mother as shown on his financial affidavit.
12. As sanctions for failure to comply with deposition production requests, Mr. Jones is ordered to pay Mrs. Jones $500 within 30 days.
13. The reasonableness of attorney for the minor child's total bill of $20,370.00 fees and $138.90 costs has been stipulated to by the parties. The court orders that each party shall pay one half of those fees and costs, the total of which is $20,508.90: half each is $10,254.45. She has received payment of $3,500.00 to date from Mrs. Jones. Mrs. Jones shall pay attorney for the minor child $6,754.45 within 45 days. She has received payment of $2,000.00 from Mr. Jones. Mr. Jones shall pay the attorney for the minor child $8,254.45 within 45 days.
14. Each party shall pay their own attorney's fees.
It is so ordered.
Munro, J.